UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ATIR DADON, <br><br> Defendant. | No. 2:17-cr-00232-GEB <br><br> REVOCATION OF MAGISTRATE JUDGE'S ORDER AUTHORIZING PRETRIAL RELEASE FOR DEFENDANT |

The United States seeks an order revoking United States Magistrate Judge Patrick J. Walsh's Order of September 18, 2018, releasing defendant Atir Dadon based upon an unsecured bond to be partially secured by property in two weeks. Mot. for Revocation at 1:18-21, ECF 100. The United States argues:

> "Dadon is a dual Israeli and American citizen who has shown a willingness to abandon his family and flee, has conspired with a co-defendant who has already fled, and has the means and connections to make such flight possible. That is, he has the means and connections to make flight comfortable for himself and his family, difficult to detect, and impossible to prevent absent detention. **Critically, these means include foreign bank holdings in Israel that Dadon failed to disclose to the magistrate court that issued the Release Order.** Accordingly, this Court should revoke the Release Order and order Dadon detained pending trial as a flight risk." Id. at 1:25-28, 2:1-4 (emphasis added).

A district court conducts a de novo review of a magistrate

1

judge's bail ruling. See United States v. Koenig, 912 F.2d 1190, 1191 (9th Cir. 1990). A district court "should review the evidence before the magistrate and make its own independent determination whether the magistrate's findings are correct, with no deference. If the performance of that function makes it necessary or desirable for the district judge to hold additional evidentiary hearings, it may do so, and its power to do so is not limited to occasions when evidence is offered that was not presented to the magistrate." Id. at 1193.

The district judge reviewed the audio recording of Dadon's appearance before Magistrate Judge Walsh. The recording makes evident that the United States did not fully present all the flight risk facts it includes in its revocation motion.

**Flight Risk**

The following evidence in the Government's revocation motion evinces that Defendant poses a flight risk under a preponderance of the evidence standard.

> "Dadon's initial instinct upon learning of the arrest of his co-defendant Bar Shani on Monday was to flee his home. Dadon could readily act upon his desire to flee at future stages of these proceedings, because he and his wife are Israeli citizens and have . . . assets both in the United States and in Israel. In addition, Dadon's co-conspirator Orel Gohar and co-defendant Yaniv Gohar have already fled to Israel, so they would be in a position to assist Dadon's flight . . .
>
> First, Dadon's behavior upon the arrest of his co-defendant, Bar Shani, presents significant evidence that he is a flight risk. On September 17, 2018, FBI agents surveilled Dadon at his residence. Later that

day, FBI in San Francisco arrested Bar Shani, Dadon's longtime business partner, co-conspirator, and co-defendant. Dadon then abandoned his wife and children and fled to an unknown location in the Los Angeles area; he did not return home that night. This instinctual reaction to realizing the probability of his own imminent arrest reveals a flight interest that was not overcome by the existence of his wife and children, refuting any argument that their existence would prevent his flight. When the prospect of detention went from abstraction to strong possibility, Dadon fled his home and family.

Moreover, when reached by phone, Dadon would not reveal his precise location to FBI agents, further illustrating why he poses a flight risk. While his attorney has proffered that the reason he fled his home for the night was to avoid being arrested in front of his children, such reasoning does not explain why he would not disclose his location to the FBI when informed that an arrest warrant had been issued for him.

That reasoning similarly does not account for Dadon's refusal to commit to turning himself in, nor his subsequent refusal to answer any calls from the FBI agents, after he had been informed of the existence of the warrant, and after FBI agents left Dadon multiple voicemails asking him to call them back. Indeed, it took the intervention of his attorneys to get Dadon to self-surrender later that morning, an intervention that does not speak favorably of Dadon's impulses when faced with potential detention at future junctures in this case.

Second, Dadon and his wife are Israeli citizens, which makes their flight to Israel a substantially easier process than if that was not the case. While Dadon is a dual citizen, his wife has only resident status in the United States. Dadon has traveled to Israel with some frequency, including in 2016 and 2017. His wife traveled to Israel as recently as August 2018. Dadon himself stated to Pretrial Services in Los Angeles that he had recently returned from a 17-day trip to Israel within the past three weeks. Fleeing to Israel would not be a challenging or unfamiliar journey for Dadon or his

3

family.

The Government further detailed other reasons for its flight risk concern in its Reply to the Defendant's Opposition:

> [] Dadon has considerable asset holdings in the United States that provide him ample resources for flight should he choose to do so, and mitigate any deterrent effect of bonds to the contrary. He owns two different properties in Sherman Oaks, California, estimated to be worth in excess of $800,000 each; he owns approximately five properties in Nevada, with an estimated combined value of $372,000; and he owns at least two vehicles and multiple water vehicles. Moreover, the LLC in which he has a declared 50% ownership interest reported $1.7 million in gross receipts and nearly $400,000 in gross income in 2017, indicating that he has an ongoing source of money even absent his money laundering activity on behalf of Orel Gohar. Exh. A ¶ 17. These resources increase the risk that Dadon flees; as the Gohar brothers showed by chartering a private flight to Mexico without appearing on the manifest, financial resources make fleeing without detection and government intervention much easier.
>
> [] Dadon's offense conduct points toward his ability to act with subterfuge, conceal financial transactions, and conspire with others who would help him flee. Dadon was indicted for conspiracy to commit money laundering. See ECF No. 94. As a part of that conduct, Dadon and co-conspirator Bar Shani utilized a limited liability corporation, ABA Cosmetics, LLC, to send checks to Orel Gohar, who in turn funneled thousands of dollars in cash to Dadon, Shani, and their employees. Exh. A ¶
>
> [] Furthermore, Dadon and Orel Gohar utilized coded language in discussing these payments—describing money as liquor bottles or other items—showing Dadon's intent to conceal the underlying source of the money, which was the specified unlawful activity in which Gohar was engaged. His offense conduct militates

4

> in favor of concluding that he poses a flight risk because unlike many other offenses, his involved (1) his receipt of untraceable cash, (2) his intent to conceal the nature, source, and location of financial transactions, and (3) his willingness to lie to investigators about those transactions when confronted. Dadon would be able to deploy the same skillset in effectuating his flight and evading detection.
>
> . . .
>
> Finally, while Dadon should not be held accountable for the fugitive status of his co-defendants, his own status as a flight risk is significantly heightened given the fact that he has individuals in the country to which he is most likely to flee who have proven willing to engage in criminal conspiracies with him in the past. Dadon is alleged to have conspired with Orel Gohar in concealing the nature of financial transactions and receiving large amounts of cash from Gohar, cash which was derived from the gambling business operated by Orel and Yaniv Gohar. Orel Gohar and Yaniv Gohar fled after being released from federal custody on substantially similar conditions to Dadon. The Gohars could use their financial resources and connections to aid and abet Dadon's flight from the United States. Since Dadon's recent overnight flight, citizenship, bank account holdings, and travel history already point toward his being a serious flight risk to Israel, the existence of two co-defendants who have already fled to Israel significantly enhances that risk. Therefore, the evidence that Dadon is a flight risk far exceeds the preponderance-of-the-evidence standard required for his detention."

Mot. for Revocation at 6-9; Gov. Repl. at 4:24-5:6.

**Failure to Disclose Israeli Bank Account to Pretrial Services**

The Government argues Dadon's failure to disclose his Israeli bank account to Pretrial Services "has probative value on the flight risk issue" indicating that because Dadon concealed his means to flee from the Court, he presents a strong flight

5

risk. Mot. at 3:10-12.

## Failure to Disclose Nevada Properties

The Government also argued Dadon's purposeful withholding of real estate in Nevada from the Pretrial Services Officer, as admitted by his attorney Mr. Sherman should be considered by the Court. Sherman Decl. at 6.

> [Dadon's] concession is accompanied by his attorney's theorizing that Dadon must have been relying upon counsel's advice that such properties would not be necessary to post bail. See Sherman Decl. at 6. But such advice does not answer the question of why Dadon did not disclose those assets' when interviewed about his financial holdings, irrespective of whether he or his attorney considered them necessary for posting bond.
>
> Regardless of his current reason for the nondisclosure, Dadon's admitted failure to provide Pretrial Services and the magistrate court with a complete picture of his asset holdings contribute to his status as a flight risk.
>
> This is particularly true where, as here, Dadon made a series of disclosures to Pretrial Services that happened to augur in favor of his release. He disclosed his Los Angeles assets, his ties to the Los Angeles area, his brother in Orange County, and his United States citizenship. See Sherman Decl. at 6.
>
> This was not a case of language difficulties or nervousness and a resulting inability to sit for an interview. Instead, Dadon was quite capable of disclosing those facts that helped him win release and withholding those facts that did not. Whether his attorney now attempts to shoulder some of the blame for that decision does nothing to change Dadon's actions—indeed, for reasons set forth below, it merely confirms a pattern for Dadon of blaming attorneys for actions that underline his status as a flight risk. Dadon remains a strong flight risk, and if he followed advice not to disclose certain assets to Pretrial Services, it is hard to see why he would not follow future advice to flee.

Gov. Repl. at 1:28-3:1-8.

Dadon admits in his declaration filed in his surrebuttal that he did not truthfully respond to the Pretrial Services Officer when asked about his assets:

> During the pretrial interview, I was asked certain questions about my assets . . . I told the Pretrial Officer about my properties in Los Angeles. I never intended to hide any of my other assets, including my bank account in Israel. I did not mention the properties in Las Vegas because of what Mr. Sherman told me about what properties might be needed for bail. I never intended to hide anything. Everything I did in this case was upon the advice of counsel. At no time did I intentionally withhold anything from the Pretrial Officer. I was only doing what I understood the lawyers were telling me to do.
>
> Surrebuttal 2:24-283:1, ECF 116 at 3.

Defendant's candor to the Pretrial Services Officer and on the affidavit is essential to the bail determination process. Some exploration of a defendant's assets or net worth is plainly contemplated by the language of Section 3142 of the United States Code which governs the release or detention of Defendant pending trial. "Without such information we fail to see how a judicial officer could arrive at a for [a bail] amount which would reasonably assure [Defendant's attendance at a proceeding]." United States v. Patriarca, 948 F.2d 789, 795 (1st Cir. 1991) (noting the forfeiture provision is a crucial release condition, its effectiveness bolstered or its inadequacy revealed by additional factfinding.)

It should be evident to Defendant that the Court does not

condone materially false statements made to probation officers, and by analogy, to pretrial services offices during an investigation for the Court, and that under certain circumstances such statements could warrant a sentencing enhancement. U.S. v. Ojo 916 F.2d 388, 393 (7th Cir. 1990)(stating that "providing false information to the pretrial services officer, who was conducting a bail investigation for the court, falls squarely within the [the obstruction of justice] application note, and led to a sentencing enhancement under U.S.S.G. § 3C1.1 (n.(1)(c)"). Compare U.S. v. Greig 717 F.3d 212, 220-22 (1st Cir. 2013)(indicating where Defendant intentionally withheld assets from Pretrial Services could be a basis for a sentencing enhancement for obstruction of justice) with United States v. Magana-Guerrero, 80 F.3d 398, 401 (9th Cir. 1996) (noting "[P]roviding materially false information to a pretrial services officer, whose job it is to conduct investigations for the court, constitutes obstruction of justice for purposes of section 3C1.1, without a specific showing that the falsehood actually obstructed justice.")

Further, a lack of candor concerning assets that could be used to flee could reasonably support an inference that Defendant's assertions he will not flee cannot be trusted. See U.S. v. Manning 704 F.3d 584, 586 (9th Cir. 2012) (finding "Defendant's manifested dishonesty on the record, combined with

her access to hidden assets and her ties outside the United States evince she cannot be trusted when she represents to the Court she will not flee."), United States v. Cerizo, 542 Fed. Appx. 641, 642 (9th Cir. 2013)(stating Defendant's "long history of dishonesty and ties outside...the United States provided an ample basis for denying his bail request.").

Here, the Magistrate Judge was not made aware of this evidence demonstrating lack of candor.

### The September 28 Hearing

At the September 28, 2018 hearing, the undersigned held in a conclusory manner that the Magistrate Judge was not in the position to make an informed release decision because of Defendant's counsel's decision to conceal certain of Defendant's asset information that should have been given to the Magistrate Judge. Such concealment shall not be condoned.

For the stated reasons, the Magistrate Judge did not have all the relevant information available to make an accurate release decision. Therefore, the Government's motion is granted and the Magistrate Judge's ruling releasing Defendant is revoked.

Dated: September 28, 2018

GARLAND E. BURRELL, JR.
Senior United States District Judge

9